**UNITED STATES BANKRUPTCY COURT**          **FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

Case No. 11-2790 (MG) SIPA

MF GLOBAL INC.,

Debtor.

HSBC BANK USA, NATIONAL ASSOCIATION,

Interpleader Plaintiff,

v.                                          Adv. Proc. No. 11-02924 (MG)

JASON FANE and JAMES W. GIDDENS, in his
capacity as Trustee for MF Global Inc.,

Interpleader Defendants.

**MEMORANDUM OPINION AND ORDER**
**APPROVING SETTLEMENT AGREEMENT**

*A P P E A R A N C E S:*

HUGHES HUBBARD & REED LLP
*Counsel for James W. Giddens, Trustee for the SIPA Liquidation of MF Global Inc.*
One Battery Park Plaza
New York, New York  10004
By:     James B. Kobak, Jr., Esq.
        Christopher K. Kiplok, Esq.
        Jeffrey S. Margolin, Esq.
        Dina R. Hoffer, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the *Motion Pursuant to Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement to Approve Settlement Agreement* (the "Motion"), filed by James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of the business of MF Global Inc. (the "Debtor" or "MFGI").  (ECF Doc. #7.)[1]  The Motion seeks approval of a settlement agreement (the "Settlement Agreement") among HSBC Bank USA, N.A. ("HSBC"), Jason Fane ("Fane"), and the Trustee (collectively, the "Parties") regarding the ownership and distribution of physical property (specifically, five gold bars and fifteen silver bars) (the "Property").  No objections have been filed to the Motion.  For the reasons discussed below, the Court grants the Motion.

## BACKGROUND

On January 23, 2012, this Court issued an order establishing a process by which former MF Global, Inc. ("MFGI") customers claiming property in the form of physical assets (*i.e.*, warehouse receipts, precious metal certificates, shipping certificates) and the Trustee would attempt to reconcile any alleged incorrect accounting with respect to the quantity and type of physical property held by the Trustee prior to the scheduled liquidation date of such property on January 31, 2012.  (ECF Doc. #867).

At all times prior to the filing date through the present, HSBC has been in possession of, and has not had any ownership interest in, the Property.  HSBC received competing claims to the Property from the Trustee and Fane; therefore, HSBC filed an interpleader complaint to request the Court to determine ownership of the Property.  The Trustee, HSBC, and Fane have resolved

---

[1]      This Motion was also filed in the main related case, *In re MF Global Inc.*, No. 11-2790, at ECF Doc. #930. For ease of reference, all futures cites to docket entries refer to those filed in *In re MF Global Inc.*, No. 11-2790.

the issues regarding Fane's Property, and the Motion seeks the Court's approval of the

Settlement Agreement that reflects that resolution.

## DISCUSSION

Prior to October 31, 2011, the filing date of these SIPA liquidation proceedings, Fane

took delivery through an MFGI customer trading account, of five gold futures contracts and three

silver futures contracts relating to five gold bars and fifteen silver bars being held by HSBC.

Also prior to the filing date, Fane requested that the Property be transferred from HSBC to

Fane's Brink's account (the "Brink's Account").  Based on the stipulated facts described below,

the Property never entered the Trustee's control of the MFGI's liquidation estate created on the

filing date.

Because the Trustee has reviewed MFGI's books and records and now acknowledges that

the Property is not part of the MFGI estate, the Trustee has instructed HSBC to release the

Property to Fane at Fane's cost within ten days upon this Court's approval of the Settlement

Agreement.  Also pursuant to the Settlement Agreement, the Parties will exchange general,

mutual releases of all claims relating to the Property and the adversary proceeding will be

dismissed with prejudice.

### A.  Legal Standard for Rule 9019 Settlements

Settlements and compromises are favored in bankruptcy as they minimize costly

litigation and further parties' interests in expediting the administration of the bankruptcy estate.

*Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).  Under Rule 9019 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the court has the authority to

"approve a compromise or settlement."  FED. R. BANKR. P. 9019(a).  A court must determine that

a settlement under Bankruptcy Rule 9019 is fair, equitable, and in the best interests of the estate

before it may approve a settlement. *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493,

496 (Bankr. S.D.N.Y. 1991) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer*

*Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see also Topwater Exclusive Fund III, LLC*

*v. SageCrest II, LLC (In re SageCrest II)*, Nos. 3:10cv978 (SRU), 3:10cv979 (SRU), 2011 WL

134893, at *8–9 (D. Conn. Jan. 14, 2011); *Cousins v. Pereira (In re Cousins)*, No. 09 Civ.

1190(RJS), 2010 WL 5298172, at *3 (S.D.N.Y. Dec. 22, 2010); *In re Chemtura Corp.*, 439 B.R.

561, 593–94 (Bankr. S.D.N.Y. 2010); *In re Lehman Bros. Holdings*, 435 B.R. 122, 134

(S.D.N.Y. 2010).

A court's responsibility is to "canvass the issues and see whether the settlement falls

below the lowest point in the range of reasonableness." *In re Chemtura*, 439 B.R. at 594

(quoting *In re W.T. Grant, Co.*, 699 F.2d 599, 608 (2d Cir. 1983)) (internal quotations omitted).

However, the court is not required to go so far as to conduct a trial on the terms to approve a

settlement. *Id.* Before making a determination, however, the court must inform itself of "all

facts necessary for an intelligent and objective opinion of the probabilities of ultimate success

should the claim be litigated." *O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 70 (Bankr.

E.D.N.Y. 2009) (quoting *TMT Trailer Ferry*, 390 U.S. at 424) (internal quotations omitted).

Although courts have discretion to approve settlements, the business judgment of the debtor in

recommending the settlement should be factored into the court's analysis. *JP Morgan Chase*

*Bank, N.A. v. Charter Commc'ns Operating LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252

(Bankr. S.D.N.Y. 2009). "At the same time, a court may not simply defer to a debtor in

possession's judgment, but must independently evaluate the reasonableness of the settlement."

*In re Rosenberg*, 419 B.R. 532, 536 (Bankr. E.D.N.Y. 2009) (citations omitted). In addition,

courts may give weight to the opinion of bankruptcy counsel supporting the settlement. *Id.* ("In

[approving the settlement agreement], the court is permitted to rely upon 'opinions of the trustee,

the parties, and their attorneys.'"); *Chemtura*, 439 B.R. at 594.

To that end, courts have developed standards to evaluate if a settlement is fair and

equitable and identified factors for approval of settlements based on the original framework

announced in *TMT Trailer Ferry, Inc.*, 390 U.S. 414 (1968).  The Second Circuit outlined the

test for consideration of settlements under the Bankruptcy Rules in *Motorola, Inc. v. Official*

*Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir.

2007).  The factors to be considered are interrelated and require the court to evaluate:

> (1) the balance between the litigation's possibility of success and
> the settlement's future benefits; (2) the likelihood of complex and
> protracted litigation, "with its attendant expense, inconvenience,
> and delay," including the difficulty in collecting on the judgment;
> (3) "the paramount interests of the creditors," including each
> affected class's relative benefits "and the degree to which creditors
> either do not object to or affirmatively support the proposed
> settlement;" (4) whether other parties in interest support the
> settlement; (5) the "competency and experience of counsel"
> supporting, and "[t]he experience and knowledge of the
> bankruptcy court judge" reviewing, the settlement; (6) "the nature
> and breadth of releases to be obtained by officers and directors;"
> and (7) "the extent to which the settlement is the product of arm's
> length bargaining."

*Id.* (internal citations omitted).  The burden is on the settlement proponent to persuade the court

that the settlement is in the best interests of the estate.  *See* 8 Norton Bankruptcy Law and

Practice 3d §167:2 (3d ed. 2011).

## B.  Legal Standard for Distribution of Physical Property

MFGI was both a futures commission merchant ("FCM") and a securities broker-dealer

before it was placed into liquidation and is thus subject to two separate regulatory regimes: SIPA

and the Commodities Exchange Act (the "CEA").  Under both regimes, customers are entitled to

a *pro rata* share of the applicable pools of customer property from separate customer account

classes.  As an FCM, MFGI was required by the CEA and Commodities Futures Trading

Commission (the "CFTC") regulations (the "Part 190 Regulations") to segregate or secure funds

and property held for its commodity futures customers.  Determining commodity customers'

claims to customer property incorporates the interplay of the Bankruptcy Code, the CEA and 17

C.F.R. § 190, within the context of a SIPA liquidation.

The CFTC's Part 190 Regulations guide trustees and assist courts in implementing the

CEA and subchapter IV of title 11 of the Bankruptcy Code.  *See* 17 C.F.R. § 190 *et seq*.  Those

regulations: (1) define what constitutes customer property, *see* 17 C.F.R. § 190.08; (2) establish a

system of customer classes and account classes, which ensures a fair and orderly process of *pro*

*rata* distribution, *see id.* §§ 190.01(a), (m), (bb), & (hh); and (3) provide a formula for

calculating allowable "net equity claims," *id.* § 190.07.

As explained below, according to the Part 190 Regulations, "[t]he *property of the*

*debtor's estate* must be allocated among account classes and between customer classes . . . ."  17

C.F.R. § 190.08 (emphasis added).  Inherent in this distribution scheme is the initial

determination that the property in question is indeed "property of the debtor's estate."  If the

property in question was not "property of the debtor's estate" on the filing date, then such

property is not subject to the distribution scheme for specifically identifiable property ("SIP")

pursuant to the Part 190 Regulations.  This necessarily must be the first inquiry in any dispute

about the distribution of physical property.  Because the Parties have stipulated that the Property

was not property of MFGI's estate on the filing date, rules otherwise applicable to the collective

distribution scheme do not apply.  An understanding of how the rules applicable to the

distribution of SIP under the Part 190 Regulations and the Bankruptcy Code is nevertheless

helpful.

1.  <u>Specifically Identifiable Property Included in the Definition of Customer Property</u>

The definition of customer property is especially relevant to the discussion of how to distribute SIP.  Section 761(10) of the Bankruptcy Code provides an expansive definition of "customer property," but the CEA states that "[n]otwithstanding title 11 of the United States Code," the CFTC may issue regulations to "provide . . . that certain cash, securities, other property, or commodity contracts are to be included in or excluded from customer property."  7 U.S.C. § 24(a).  The CFTC drafted 17 C.F.R. § 190.08, which specifies fifteen categories of "customer property."  "Specifically identifiable property" is a class of property defined as, among other things:

> physical commodities received, acquired, or held by or for the account of the debtor for the purpose of making or taking delivery or exercise from or for the account of a customer, any such document of title or commodity which as of the entry of the order for relief can be identified on the books and records of the debtor as received from or for the account of a particular customer as held specifically for the purpose of delivery or exercise.

17 C.F.R. § 190.01(kk)(3).  Section 190.08(a)(ii)(C) further confirms that SIP is included in the definition of "customer property."

2.  <u>Customer Classes and Account Classes</u>

Section 766 of the Bankruptcy Code requires that commodity customer property be distributed ratably.  *See* 11 U.S.C. § 766(h).  Additionally, section 190.08 of the Part 190 Regulations provides that the trustee must allocate the "property of the debtor's estate . . . among account classes and between customer classes."  17 C.F.R. § 190.08.  Each of those allocated amounts is then treated as "a separate estate of the customer class and the account class to which it is allocated."  17 C.F.R. § 190.08.  Customers are grouped into two classes pursuant to section 190.01(m) of the Part 190 Regulations:  public customers and non-public customers.  A "non-public customer" is a customer who is an insured, affiliate, or controlling person or entity of the

7

debtor, and all other customers are "public customers."  Pursuant to section 766(h) of the

Bankruptcy Code, all allowable net equity claims by public customers must be satisfied in full

before any distribution may be made to any non-public customer.  *See* 11 U.S.C. § 766(h).

      In addition to the two customer classes, the Part 190 Regulations also establish six types

of customer accounts that must be recognized by the trustee as separate "account classes" for

various purposes in liquidation.  The six account classes are: (1) futures accounts, (2) foreign

futures accounts, (3) leverage accounts, (4) commodity option accounts, (5) delivery accounts,

and (6) cleared over-the-counter derivative accounts.  The purpose of delineating separate

account classes is to allocate customer property on a *pro rata* basis among customers that belong

to a specific account class.  *See* 17 C.F.R. § 190.08(c)(1);[2] *see also* 46 Fed. Reg. at 57554 ("This

approach is consistent with the fact that differing segregation requirements exist for different

classes of accounts.  Obviously, much of the benefit of segregation would be lost if property

segregated on behalf of a particular account class could be allocated to pay the claims of

customers of a different account class for which less stringent segregation provisions were in

effect.").

      In establishing the "delivery account" class under 17 C.F.R. § 190.05(a)(2),[3] the CFTC

sought to "mitigate the dilution effect of the *pro rata* provisions of the Code with respect to

---

[2]      Section 190.08(c)(1) states:

        Subject to paragraph (b) of this section, property held by or for the account of a
        customer, which is segregated on behalf of a specific account class, or readily
        traceable on the filing date to customers of such account class, must be allocated
        to the customer estate of the account class for which it is segregated or to which
        it is readily traceable.

[3]      Section 190.05(a)(2) provides that a delivery account

        shall mean any account prominently designated as such in the records of the
        debtor which contains only the specifically identifiable property associated with
        delivery set forth in §190.01(kk) (3), (4), and (5), except that with respect to

8

property or cash captured by the estate in the absence of any category of property which can be reclaimed in full [(*i.e.*, specifically identifiable property)]" and "reduce the dilution effect of proration without offending the basic principle of proration of equivalent claims." 48 Fed. Reg. 8716, 8731. Thus, pursuant to sections 190.05(a)(2), 190.08(c)(1) of the Part 190 Regulations, SIP referred to in section 190.01(kk)(3), (4) and (5) "will not be diluted by other types of customer claims." *Id.* Thus, customers whose claims relate to SIP that falls into the "delivery account" class will not be subject to the same *pro rata* distribution that other customers will receive. However, customers who owned SIP that was not held in a delivery account and was used for some other purpose (*e.g.*, to margin a securities account) will be subject to the *pro rata* distribution applicable to their specific class.

However, those issues are fact-specific among individual claimants and must be resolved in the customer claims process. To meet the criteria for SIP that is part of a "delivery account," a customer must show that its property is a warehouse receipt, bill of lading, or other document of title or physical commodity held specifically for the purpose of delivery or exercise, which as of the filing date is specifically identifiable on the debtor's books and records as received from or for the account of a particular customer.

### C.  Evaluation of the Range of Reasonableness

It appears that the Property claimed by Fane falls into the definition of "specifically identifiable property" under the Part 190 Regulations. If the Property were property of MFGI's estate, the Trustee would be obligated to allocate the Property among account classes and between customer classes pursuant to 17 C.F.R. § 190.08; as Fane is a public customer, the

---

§190.01(kk) (4) and (5), delivery need not be made or taken and exercise need not be effected for such property to be included in a delivery account.

Trustee would be obligated to allocate the Property on a *pro rata* basis among other customers that belonged to his account class. *See* 17 C.F.R. § 190.08(c)(1).

Here, the fact-specific initial inquiry performed by the Trustee whether the Property even qualified as property of the MFGI's estate revealed that it is not; for this reason, the Property is not under the control of the Trustee and should not be allocated among account classes and between customer classes. The Parties have stipulated that (1) the Property is not MFGI customer property under the Part 190 Regulations, (2) HSBC shall deliver the Property to Fane at his expense, (3) the Parties will exchange mutual releases of all claims related to the Property, and (4) the adversary proceeding will be dismissed with prejudice.

In light of the stipulated facts, the Settlement Agreement clearly falls within the range of reasonableness described in *In re W.T. Grant, Co.*, 699 F.2d 599 and complies with the *Iridium* factors, as applicable. Furthermore, the Settlement Agreement will resolve all claims between the Parties related to the Property and will save the costs of further litigation. The Court is also satisfied that the Settlement Agreement is the result of arm's-length negotiations and good-faith dealings among the Parties.

**CONCLUSION**

For the reasons explained above, the Motion is granted.  A separate order will be entered approving the Settlement Agreement.


Dated:  March 7, 2012
        New York, New York.


                                  **  /s/Martin Glenn  **
                                     MARTIN GLENN
                             United States Bankruptcy Judge